UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MICHAEL BARNEY,

                            Plaintiff,

                    v.

H.E.L.P. HOMELESS SERVICE
CORPORATION,

                            Defendant.

---

19 Civ. 5959 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

        Plaintiff Michael Barney brought this action against his former employer,

H.E.L.P. Homeless Service Corporation ("HELP" or "Defendant"), for whom he

worked for approximately six weeks in 2017.  Plaintiff claims that his

supervisor at HELP subjected him to a hostile work environment because of his

sex and sexual orientation, retaliated against him because of his complaints

about her discriminatory practices and hostile work environment, and then

terminated him because of his sexual orientation, all in violation of Title VII of

the Civil Rights Act of 1964, *codified as amended at* 42 U.S.C. §§ 2000e to

2000e-17 ("Title VII"); the New York State Human Rights Law, N.Y. Exec. Law

§§ 290-297 (the "NYSHRL"); and the New York City Human Rights Law, N.Y.C.

Admin. Code §§ 8-101 to 8-131 (the "NYCHRL").  The Court previously denied

Defendant's motion to dismiss Plaintiff's Title VII claims, and the parties

proceeded to discovery.  Defendant now moves for summary judgment under

Federal Rule of Civil Procedure 56.  For the reasons set forth in the remainder

of this Opinion, the Court grants in part and denies in part Defendant's

motion.

## BACKGROUND[1]

### A.  Factual Background

### 1.  The Parties

The Court has discussed the factual and procedural history of this case in its prior Opinion resolving Defendant's motion to dismiss.  (Dkt. #24).  *See Barney* v. *H.E.L.P. Homeless Serv. Corp.*, No. 19 Civ. 5959 (KPF), 2020 WL 1699984 (S.D.N.Y. Apr. 8, 2020).  However, because that Opinion addressed a narrow procedural challenge to Plaintiff's Title VII claims, and was issued prior to the consummation of discovery, the Court will expand upon its earlier factual recitation.

---

[1]    The facts set forth in this Opinion are drawn from Defendant's Local Civil Rule 56.1 Statement ("Def. 56.1" (Dkt. #45)); Plaintiff's Local Civil Rule 56.1 Counterstatement ("Pl. 56.1" (Dkt. #50)); Defendant's Response to Plaintiff's Local Civil Rule 56.1 Counterstatement ("Def. 56.1 Reply" (Dkt. #55)); various declarations submitted by the parties (including the exhibits attached thereto), which are cited using the convention "[Name] Decl."; and certain deposition transcripts, which are cited using the convention "[Name] Dep."  Certain exhibits appended to the parties' declarations include documents exchanged by the parties during discovery.  For those exhibits, the Court's pinpoint citation references the document's Bates-stamp number.

Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").  Additionally, to the extent that Plaintiff purports to dispute facts in Defendant's Rule 56.1 Statement with inadmissible evidence or with evidence that does not support the proposition for which it is advanced, the Court finds such facts to be true.

For ease of reference, Defendant's opening brief is referred to as "Def. Br." (Dkt. #42); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #49); and Defendant's reply brief as "Def. Reply" (Dkt. #54).

Plaintiff identifies as "an openly gay man" who does not "hide" his sexual orientation. (Barney Decl. ¶ 6; Barney Dep. 103:16-20, 125:20-25). He was previously employed by Defendant, a corporation that operates homeless prevention programs. (Def. 56.1 ¶ 1). Defendant's employees are responsible for assisting clients with, among other things, maintaining housing stability. (*Id.*).

Defendant has implemented certain policies and procedures relevant to the instant litigation. In particular, Defendant maintains an Employee Handbook, which contains Equal Employment Opportunity ("EEO") and Sexual Harassment policies. (Def. 56.1 ¶ 2; *see also* Zoldessy Decl., Ex. F ("EEO and Sexual Harassment Policies")). The EEO Policy prohibits discrimination on the basis of any protected classification, including on the basis of sex or sexual orientation. (*See* EEO and Sexual Harassment Policies at D000074). The Sexual Harassment Policy prohibits harassment on the basis of sex or gender and any other inappropriate workplace behavior, as well as retaliation for reporting any claim of sexual harassment. (*Id.* at D000076-77).

Plaintiff was hired by Defendant on May 9, 2017, as a clinical social worker. (Def. 56.1 ¶ 6). Upon the commencement of his employment, he received Defendant's Employee Handbook. (*See id.* at ¶ 5; *see also* Barney Dep. 48:10-22; Zoldessy Decl., Ex. G (Plaintiff May 9, 2017 Acknowledgement of Receipt of Employee Handbook)).

### 2.    Plaintiff's Initial Employment and Relationship with Goodrich

Plaintiff was offered his position with Defendant by Tina Goodrich, the Program Director of Defendant's "New Beginnings" program, following an in-person interview with Goodrich on April 3, 2017.  (Def. 56.1 ¶¶ 9, 12-13).  Goodrich had received Plaintiff's resume from HELP's Senior Vice President Daniel Farrell, who suggested that Plaintiff could be a "good fit" for the New Beginnings program.  (*Id.* at ¶ 8).  Farrell further approved the decision to hire Plaintiff.  (*Id.* at ¶ 15).

Plaintiff was Goodrich's first hire for the New Beginnings program.  (Def. 56.1 ¶ 14).  His employment began with an initial six-month probationary period.  (*Id.* at ¶ 7).  During this period, Plaintiff was supervised by Goodrich, who was in turn supervised by Farrell.  (*Id.* at ¶¶ 16-17).  Plaintiff met with Goodrich on a weekly basis to discuss his work and the challenges faced by his clients.  (*Id.* at ¶ 24).

At some point after the commencement of his employment, Plaintiff and two of his colleagues at HELP, Kerry Ann and Tiffany Brown, were "admiring" a photograph on Plaintiff's phone of a man wearing a romper.  (Barney Decl. ¶¶ 13-15; Barney Dep. 129:5-16).  Goodrich overheard Plaintiff commenting that the romper "looked good" on the man in the photograph, and responded along the lines of: "Why are men wearing women's clothing?  We women can't have anything for ourselves anymore?"  (Barney Decl. ¶¶ 15-16; *see also* Barney Dep. 129:17-23 ("[H]er comments were, 'That's the problem now.  They can't leave anything for us.  Men always want — these men always want to be

women.'")).  Plaintiff later attempted to speak with Goodrich about her comments, but was told by Goodrich that "this [was] the way things go … at HELP," and "[i]f [he] did not want to be here, [he] could find another job." (Barney Dep. 130:12-16).  While Plaintiff's colleague and friend Tiffany Brown has a similar recollection of this incident (*see* Brown Decl. ¶¶ 14-22; Barney Dep. 139:19-140:9 (discussing his relationship with Brown)), Goodrich testified that this exchange did not happen, and that she has never said anything along the lines of "[m]en should be men and women should be women" (Goodrich Dep. 99:8-15).

Plaintiff testified that, after and as a result of this incident, Goodrich knew that he identified as a gay man.  (Barney Dep. 129:24-130:11 ("She knew in that moment … when I said, 'Oh, he's cute and that looks good on him[.]'")).  Goodrich, for her part, testified that she was never aware of Plaintiff's sexual orientation during the period of his employment.  (Goodrich Dep. 99:2-4).  The day after the romper incident occurred, Plaintiff received an email from Goodrich with "job vacancies" for which "the minimum requirement was a master's degree."  (Barney Dep. 194:6-15).  Plaintiff understood that this email was directed towards him, as his clients "barely had high school diplomas." (*Id.* at 194:16-18).  In a declaration submitted in connection with his opposition to the instant motion, Plaintiff has further attested that after this incident, Goodrich's hostility "in voice, tone and manner increased towards [him]," and that she: (i) required him to email her every day to notify her that he was going to lunch, when no other employees were required to do this;

(ii) berated him in front of colleagues on several occasions; (iii) criticized his work performance harshly for minor issues; and (iv) required him to take public transportation to client meetings even though he had access to a car. (Barney Decl. ¶¶ 18-26, 38).[2]  Both Plaintiff and Brown have attested that Goodrich also made disapproving references to "those people" and "those men" when referring to either gay men or members of "the LGBT community" (*id.* at ¶ 5; Brown Decl. ¶¶ 10-11).[3]

Plaintiff recalls an additional comment by Goodrich, although it is unclear whether this comment was made towards the beginning or end of his employment with HELP.[4]  On one occasion, Plaintiff was smoking a cigarette

---

[2]     Plaintiff further attests that on one occasion after the romper discussion, Goodrich criticized him for not signing and placing his notes in a client file.  (Barney Decl. ¶ 22). He showed her that he had in fact signed and filed his notes.  (*Id.*).  Instead of acknowledging her error, she shouted: "[T]hat's not how I want it!  I want it like this! Do you hear me talking to you?"  (*Id.* at ¶ 23).  These comments were said in the presence of other HELP employees, and made Plaintiff feel "humiliated and ashamed." (*Id.*).  On another occasion, Plaintiff was working with a client who wanted to know if they were qualified to receive a playpen.  (*Id.* at ¶ 40).  After Plaintiff informed the client that he would inquire on their behalf (*id.* at ¶ 41), Goodrich "stepped in and spoke over [him], telling the client that [Plaintiff] was wrong and that they would be receiving a playpen," when "it had not yet been determined whether [the client was] eligible" (*id.* at ¶ 42).  Plaintiff did not discuss these incidents in his deposition.

[3]     In his deposition, Plaintiff did not discuss much of Goodrich's conduct described in his declaration, but did address one occasion on which he was required to take public transportation (Barney Dep. 112:21-113:25), as well as the requirement that he inform Goodrich that he was going to lunch (*id.* at 189:12-22).  He also testified that she "belittle[d] [him] in front of others" and "micromanage[d] him."  (*Id.* at 127:13-14). Goodrich has stated that she required Plaintiff to take mass transportation on one occasion, as he was making a client visit with a co-worker who indicated that she was new to driving and was uncomfortable taking her car on the visit.  (Goodrich Dep. 98:13-25).  She has further represented that it was "common practice" for her supervisees to inform her when they were leaving the building "for safety reasons."  (*Id.* at 91:4-8).

[4]     While in his declaration, Barney asserts that this interaction took place "approximately two weeks" after his May 9, 2017 start date (Barney Decl. ¶ 7), in his deposition he testified that it occurred some time between June 5, 2017, and his termination on June 22, 2017 (Barney Dep. 136:4-19).  This is one of several inconsistencies in Plaintiff's chronology of his relationship with Goodrich.

6

outside the HELP office when he was joined by Goodrich. (Barney Dep. 135:18-21; Barney Decl. ¶ 7). A man wearing a "very tight top" and "skin-tight jeans" walked by. (Barney Dep. 135:22-25; *see also* Barney Decl. ¶ 8 (describing the man as having "a feminine gender expression" and "saunter[ing] by in a way that is adopted by some gay men")). Plaintiff attests that Goodrich commented: "[A]ll these men walking around here acting like women, they need to start acting like men. People need prayers." (Barney Decl. ¶ 10). Plaintiff did not respond. (*Id.* at ¶ 12). Goodrich denies ever making this statement. (Goodrich Dep. 99:16-22).

### 3. The New Beginnings Program, Plaintiff's Performance Issues, and Plaintiff's Email to Farrell

The New Beginnings program was a "Critical Time Intervention" program, with the mission of assisting clients with either securing housing or remaining in their current homes and helping them develop the skills necessary to avoid becoming unhoused. (Def. 56.1 ¶ 18). The program was structured to span nine months, during which period clients were prepared to live independently upon graduation. (*Id.* at ¶ 19). As part of his work with the New Beginnings program, Plaintiff was required to meet with clients to conduct an intake and assessment. (Goodrich Dep. 45:6-10). He was permitted to hold these meetings either in the HELP office or in clients' homes. (Def. 56.1 ¶ 20; Pl. 56.1 ¶ 20). However, "one-on-one" meetings with clients were also permitted to take place "outside," such as at "a park or a fast-food [restaurant.]" (Pl. 56.1 ¶ 20; *see also* Goodrich Dep. 46:12-23). Plaintiff's understanding was that he was required to schedule any client home visits in advance, and to send a

calendar invite to Goodrich to make her aware of upcoming meetings.  (Def. 56.1 ¶¶ 21-22; *see also* Barney Dep. 50:18-51:9).[5]

On one occasion in May 2017, Plaintiff informed Goodrich that he was "stepping outside for a break."  (Goodrich Dep. 91:9-10; Barney Dep. 67:12-16, 107:5-10).  Goodrich became worried when Plaintiff did not return to the office shortly thereafter, and called his personal mobile phone and emailed him to inquire about his whereabouts.  (Goodrich Dep. 91:10-18).  Plaintiff did not respond to Goodrich's call or email, and returned to HELP's office within approximately 40 minutes of when he had left.  (*Id.* at 91:19-20; *see also* Zoldessy Decl., Ex. O (indicating that Plaintiff's whereabouts were unknown between 9:05 a.m. and 9:45 a.m.)).  Goodrich noticed that he had two bags of groceries in hand.  (Goodrich Dep. 91:21-23).  Plaintiff explained to Goodrich that he had stepped out to attend to an emergency involving his mother.  (Goodrich Dep. 92:11-12; Barney Dep. 67:12-16, 68:13-15).  Over the course of his phone conversation with his mother and sister, he had walked to the grocery store and purchased a sandwich, a bag of chips, and a drink.  (Barney Dep. 115:21-116:12).  Goodrich informed Plaintiff that he should have explained the situation to her prior to his leaving the office.  (Goodrich

---

[5]     Plaintiff has submitted a document titled "Policy and Procedures for HELP USA's Home Visits," which provides that: "[T]here may be times where home visits are not able to be scheduled.  An attempt must be made to contact the client by telephone prior to going to the home."  (Weiss Decl., Ex. A at D000060).  The document also provides that there must "always" be "no less than two staff members at all times conducting home visits," and that the "only exception" is "a written approval from the Program Director."  (*Id.* at D000061).  Further "[h]ome visits [do] not have to occur at the client's home," but "can be conducted in a neutral place (*i.e.* McDonalds, coffee shop)."  (*Id.*).

Dep. 92:11-14; *see also* Barney Dep. 68:16-19 (testifying that Goodrich said: "Okay, understand, but that's not allowed. This is a red flag. I'm going to make a note to file. You are not in trouble, but just be mindful.")).[6]

On the morning of May 30, 2017, Plaintiff emailed Goodrich that he anticipated arriving at the HELP office around noon "due to a situation beyond [his] control." (Weiss Decl., Ex. A at D000124 (May 30, 2017 email from Plaintiff to Goodrich)). Goodrich recalls that upon Plaintiff's arrival, he explained that he was late because he had just returned from Washington, D.C. (Def. 56.1 ¶ 28; Goodrich Dep. 94:3-15). Plaintiff does not recall visiting Washington D.C. during this time period. (Pl. 56.1 ¶ 28; Barney Dep. 75:3-14).[7] The following day, Plaintiff emailed Goodrich seeking to make up the three hours of work that he had missed when he arrived late the previous day. (Def. 56.1 ¶ 27; *see also* Zoldessy Decl., Ex. J (May 31, 2017 emails between Plaintiff and Goodrich)). Goodrich informed Plaintiff that he would not be able to make up the time. (Zoldessy Decl., Ex. J).

On June 5, 2017, a Monday, Plaintiff arrived at the HELP office an hour after his start time, without providing notice to Goodrich. (Def. 56.1 ¶ 31; Pl. 56.1 ¶ 31; *see also* Zoldessy Decl., Ex. M (June 5, 2017 email from Goodrich to

---

[6]     In his declaration, Plaintiff has a different recollection of this exchange, and asserts that he was "accused ... of leaving work for no good reason." (Barney Decl. ¶ 32). As discussed *infra*, the Court gives little weight to assertions in Plaintiff's declaration that are inconsistent with his deposition testimony. *See infra* note 11.

[7]     Plaintiff's Local Rule 56.1 Statement contends that "his train records" reflect that he travelled to Washington D.C. on May 26, 2017, and returned to New York the following day. (Pl. 56.1 ¶ 28). However, those train records are not included in the record before the Court.

Plaintiff with the subject line, "Whereabouts?")).  Plaintiff told Goodrich that his late arrival was due to an unscheduled visit at a client's home.  (Goodrich Dep. 52:11-19).  He further explained that during a scheduled home visit conducted the previous Friday, June 2, 2017, he had forgotten to ask his client to sign a release of information form.  (Def. 56.1 ¶ 32; Pl. 56.1 ¶ 33).  He realized the error on June 4, 2017, but did not tell Goodrich at the time, and was not permitted to contact the client, as it was a Sunday.  (Barney Dep. 86:19-87:14).  Plaintiff represented that he had instead gone to the client's home the morning of June 5, 2017, to ask for her signature on the form (Def. 56.1 ¶ 34), and that he had met the client and her husband outside the client's home (Barney Dep. 98:3-5).  Plaintiff then erroneously dated the form May 2, 2017.  (Def. 56.1 ¶ 37; Pl. 56.1 ¶¶ 37-38).

Goodrich had concerns about the misdated release of information form, as well as Plaintiff's failure to notify her of his unscheduled home visit.  (Def. 56.1 ¶¶ 40-41).  However, she approved Plaintiff's late arrival within HELP's time entry system when requested by Plaintiff.  (Weiss Decl., Ex. 1 at D000231 (June 15, 2017 email from Goodrich: "I'm not going to mention the rejected punch because I approved after knowing the facts."); *see also* Farrell Dep. 53:2-54:4 (discussing the process for supervisory approval of late time entries)).

Goodrich testified that during the week of June 5, 2017, she spoke with Plaintiff's client, and during that conversation the client represented that she had *not* met with Plaintiff since his initial visit on June 2, 2017.  (Def. 56.1 ¶ 43; Goodrich Dep. 84:14-85:11).  Plaintiff testified that Goodrich confronted

him about her conversation with the client, and he responded: "That's not true." (Barney Dep. 99:12-15). Plaintiff explained to Goodrich that the client's husband had been present during the June 5, 2017 meeting, and that Plaintiff felt that the husband "ha[d] an issue with [Plaintiff] being gay and coming around." (*Id.* at 100:3-15). Plaintiff contends that Goodrich responded that if Plaintiff had told her about his "alternative lifestyle," she would have transferred the client to another case worker. (*Id.* at 100:16-20). Goodrich recalls only that Plaintiff indicated that there may have been issues with the client's husband due to "cultural reasons." (Goodrich Dep. 89:6-22).

On June 12, 2017, Plaintiff emailed Farrell, asking: "Do you have a block of free time this week for you and I to have a meeting regarding supervision?" (Zoldessy Decl., Ex. Q). Plaintiff testified that his email was an "attempt[]" to complain that he was being subjected to discrimination by Goodrich. (Barney Dep. 109:5-16).

Farrell did not respond to Plaintiff, but instead reached out to Goodrich, and explained that he would not be able to supervise Plaintiff. (Farrell Dep. 126:21-127:3; Goodrich Dep. 104:11-18). Goodrich responded that she would "explain," and then met with Farrell to discuss Plaintiff's and his client's conflicting accounts of the unapproved June 5, 2017 home visit. (Goodrich Dep. 106:10-16). She testified that: "at this point, I knew … that [Plaintiff's] employment … should not continue." (*Id.* at 106:16-19). According to Plaintiff, Goodrich informed him that she had heard that he wanted to speak with Farrell. (Barney Dep. 191:2-15; *see also* Barney Decl. ¶ 84 ("She confronted

11

me about the email, saying 'Danny said you have an issue you wanted to speak to him about.  You should discuss it with me.'")).[8]

On June 13, 2017, Goodrich sent Plaintiff an email as "documentation" of their conversation regarding the purported home visit.  (Weiss Decl., Ex. A at P00126-27).  Goodrich's email details her concerns with the erroneously dated release of information form, explaining: "forms cannot be back dated, and [clients] must sign and date for themselves."  (*Id.*).  She also summarized the conversation about the client as follows:

> I informed you, I spoke with [REDACTED] on 6/9/17 in which she clearly stated twice, of not meeting or seeing you on Monday, 6/5, and how home visit on Friday, 6/2 was the only time you both met.  You blurted out, "she's lying."  I asked you why would she lie, and you described her as "she is a liar, she's crazy and her husband due to cultural reasons has an issue with not wanting to be in the program (NB), and probably has an issue with you as a man coming to the home."  I explained if there was a concern with the client's husband, it was your responsibility of notifying me, and I would have reassigned the client to another CSW.

(*Id.*).  Goodrich concluded: "the above is a red flag, and will be addressed directly with Danny my supervisor."  (*Id.*).  Plaintiff responded two days later, explaining that he had "confused" the date on the release form with another client, and that moving forward, he would have his clients sign and date their release forms when he first met with them.  (*Id.* at P00126).  He further

---

[8]   Plaintiff testified that sometime after his email to Farrell, he "attempted" to speak to Farrell on the phone, but received no response, and did not leave a message.  (Barney Dep. 110:9-11, 110:15-20).  He also intended to speak to Farrell at a "clinical case manager symposium," but refrained from doing so as Farrell was with Goodrich for the duration of the conference, and Plaintiff did not want to speak with Farrell about "the situation" in front of Goodrich.  (*Id.* at 110:12-14, 111:12-24).

represented that he was "totally unaware" that client home visits were required to be pre-approved. (*Id.*). He also had a different recollection of his characterization of the client and her husband: "I never once referred to [REDACTED] as crazy. My words were aimed towards [REDACTED] and his off-putting demeanor, I assume to this [*sic*] cultural sensitivities." (*Id.*).

### 4. Plaintiff's 30-Day Performance Evaluation and Termination

On June 15, 2017, Goodrich sent Nicole Richards, HELP's Executive Director, a draft of her 30-day probationary period evaluation of Plaintiff. (Weiss Decl., Ex. 1 at D000223).[9] In her email, she asked: "Do you think it needs to be much lower?" (*Id.*). In Richards's response to Goodrich, she observed that Plaintiff had not received a score over 2, "so [it's] okay." (*Id.*). Goodrich has explained that to pass an evaluation, a HELP employee must receive a score of "two or above." (Goodrich Dep. 134:4-9). Later that day, Goodrich sent Richards a draft of her evaluation memorandum, and asked: "Can you piece together this memo, send to me, and I'll send to HR." (Weiss Decl., Ex. 1 at D000223).

Goodrich's 30-Day Evaluation Summary is dated June 15, 2017, and identifies "issues of concern" with respect to Plaintiff's performance. (Zoldessy Decl., Ex. O (the "Evaluation")). The Evaluation details (i) the incident where Plaintiff's whereabouts were unknown for approximately 40 minutes, and (ii) the incident where he misdated a client release form and claimed to have

---

[9]    The Court understands that Goodrich may have begun drafting the evaluation on or around June 9, 2017. (Goodrich Dep. 108:5-8 ("Q. So am I correct that this review was done on June 9 of 2017?  A. It could have been a day after, a couple of days after.")).

made an unscheduled and unapproved home visit with the client, which the client then denied.  (*Id.*).  Goodrich concludes that Plaintiff "has difficulty following my directives, lacks integrity, demonstrates very little desire to take responsibility for his mistakes and consistently tries to undermine my authority."  (*Id.*).  As a result, "[m]y memo serves as a request for separation of employment for [Plaintiff]."  (*Id.*).

On June 16, 2017, Goodrich emailed a HELP Human Resources employee, copying Farrell, stating that Plaintiff had "failed his 30 day evaluation" and that she was "requesting separation of employment."  (Zoldessy Decl., Ex. P at 2).  In a separate email exchange from the same day, Richards told Goodrich that Plaintiff's termination wouldn't happen that day.  (Weiss Decl., Ex. 1 at D000194).  Richard explained: "They gonna ask you questions and might ask to wait until 90 day [eval] to see if there is any change in his behavior."  (*Id.*).  Goodrich indicated that she would "dispute [HR] on that 90 day thing."  (*Id.*).  She continued: "He made an egregious error by lying about a home visit.  That can't [happen] and I do not trust him going out in the field which is part of the job description."  (*Id.*).  Goodrich emailed Richards again, just minutes later, noting that Plaintiff had worn sneakers to work that day, and had indicated that he was unaware that sneakers were not allowed, despite an email and handbook indicating as much.  (*Id.*).  Goodrich wrote: "I'm so sick of his lies."  (*Id.*).

On June 21, 2017, Human Resources responded to Goodrich's request for Plaintiff's termination: "[A]s discussed, please move forward in the

morning." (Zoldessy Decl., Ex. P at 1).  The next day, Plaintiff was terminated in a meeting with Goodrich and HELP's Assistant Executive Director.  (Def. 56.1 ¶ 51).  Goodrich testified that Plaintiff refused to sign his probationary period evaluation during the meeting (Goodrich Dep. 131:14-17), although Plaintiff testified that he did not receive any documentation outlining the reasons for his termination (Barney Dep. 114:12-14; *see also* Barney Decl. ¶ 92).

## B.   Procedural History

Plaintiff commenced this action with the filing of his original complaint on June 25, 2019.  (Dkt. #1).  With the Court's leave, Plaintiff thereafter filed an Amended Complaint on October 1, 2019 (Dkt. #17), which pleading survived Defendant's subsequent motion to dismiss.  *See Barney*, 2020 WL 1699984.

Following the Court's denial of Defendant's motion to dismiss, Defendant filed its Answer to the Amended Complaint (Dkt. #25), and the Court entered the parties' Case Management Plan and Scheduling Order (Dkt. #29).  The parties proceeded to discovery, during which time they participated in an unsuccessful mediation.  Following the close of discovery, the Court held a conference with the parties on December 8, 2020.  (Minute Entry for December 8, 2020; *see also* Dkt. #39 (transcript)).  At that conference, the Court set a briefing schedule for Defendant's anticipated motion for summary judgment.  (Minute Entry for December 8, 2020).  Defendant's opening papers were filed on February 16, 2021 (Dkt. #41-45); Plaintiff's opposition papers

were filed on March 27, 2021 (Dkt. #49-51);[10] and briefing concluded with the

submission of Defendant's reply papers on April 9, 2021 (Dkt. #54-55).

## DISCUSSION

### A.    Summary Judgment Under Fed. R. Civ. P. 56

A "court shall grant summary judgment if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to

---

[10]    In its reply brief, Defendant argues that Plaintiff's declaration submitted in conjunction with his opposition briefing is "devoid of any admissible evidence" and "cannot create a material issue of fact[.]"  (Def. Reply 5-6 (discussing Barney Decl.)).  The Court agrees that to the extent Plaintiff's declaration relies upon "purely conclusory allegations of discrimination," such allegations will not support a finding that a material issue of fact exists.  *See Potash* v. *Fl. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 577 (S.D.N.Y. 2013); *see also Mason Tenders Dist. Council Welfare Fund* v. *LJC Dismantling Corp.*, 400 F. Supp. 3d 7, 15 (S.D.N.Y. 2019) ("Self-serving, conclusory affidavits, standing alone, are insufficient to create a triable issue of fact and defeat a motion for summary judgment." (quoting *Aersale Inc.* v. *Ibrahim*, No. 13 Civ. 713 (KBF), 2013 WL 5366384, at *3 (S.D.N.Y. Sept. 25, 2013))).  However, the Second Circuit has also observed that:

> In discrimination cases, the only direct evidence available very often centers on what the defendant allegedly said or did.... Since the defendant will rarely admit to having said or done what is alleged ... the issue frequently becomes one of assessing the credibility of the parties.  At summary judgment, however, that issue is necessarily resolved in favor of the nonmovant.  To hold, as defendants ask us to do, that the nonmovant's allegations of fact are (because "self-serving") insufficient to fend off summary judgment would be to thrust the courts — at an inappropriate stage — into an adjudication of the merits.  Such a radical change in the courts' role would be inappropriate not just in the discrimination context, but everywhere.

*Danzer* v. *Norden Sys., Inc.,* 151 F.3d 50, 57 (2d Cir. 1998) (internal citations omitted); *accord Grimes-Jenkins* v. *Consolidated Edison Co. of N.Y., Inc.*, No. 16 Civ. 4897 (AT), 2021 WL 1226658, at *4 (S.D.N.Y. Mar. 31, 2021).  The Court thus declines to disregard the entirety of Plaintiff's declaration, but will not consider statements that it deems conclusory.  *See Grimes-Jenkins*, 2021 WL 1226658, at *4.

The Court will also not consider any statements made by Plaintiff that "by omission or addition, contradict[] [his] previous deposition testimony."  *Kennedy* v. *City of New York*, 570 F. App'x 83, 84 (2d Cir. 2014) (summary order) (quoting *Hayes* v. *N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)).  "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."  *Hayes*, 84 F.3d at 619 (quoting *Perma Rsch. & Dev. Co.* v. *Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)).  As such,

judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).[11]  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (citation and internal quotation marks omitted).  A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248.

While the moving party "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,'" *ICC Chem. Corp.* v. *Nordic Tankers Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Celotex*, 477

---

"factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Id.*

The Court will briefly address certain other issues with Plaintiff's opposition submission that suggest a lack of care in its preparation.  *First*, Plaintiff's briefing contains several references to "(DATE)" and "(CITE)", where it appears Plaintiff may have intended to insert certain factual information and citations, but failed to do so.  (*See* Pl. Opp. 13, 19).  While the Court has endeavored to identify the referenced information to the best of its ability, these missing citations do not give the Court confidence in Plaintiff's familiarity with the underlying record.  The Court was also unaided by the "Statement of Facts" in Plaintiff's opposition brief, which entirely lacks citations to the record.  (*See id.* at 5-12).  *Second*, as noted by Defendant (*see* Def. Reply 1 n.1), Plaintiff's Local Rule 56.1 Counterstatement fails to comply with Rule 5(c)(ii) of the Court's Individual Rules of Practice in Civil Cases, which provides that "opposing parties must reproduce each entry in the moving party's 56.1 Statement, and set out the opposing party's response directly beneath it."  The Court nevertheless relies upon Plaintiff's Rule 56.1 Statement, subject to the provisos set forth *supra* at note 2, but admonishes Plaintiff and his counsel to be more mindful of the Court's Individual Rules going forward.

[11]     The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

U.S. at 323), the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).  Rather, the non-moving party "'must set forth specific facts showing that there is a genuine issue for trial.'" *Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).  In considering "what may reasonably be inferred" from evidence in the record, however, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting *Cty. of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)).  Moreover, "[t]hough [the Court] must accept as true the allegations of the party defending against the summary judgment motion, ... conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing *Matsushita*, 475 U.S. at 587; *Wyler* v. *United States*, 725 F.2d 156, 160 (2d Cir. 1983)); *accord Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

**B.      The Court Grants in Part and Denies in Part Defendant's Motion for Summary Judgment as to Plaintiff's Hostile Work Environment Claims**

**1.      Applicable Law**

**a.      Hostile Work Environment Claims Under Title VII and the NYSHRL**

The Court first addresses Defendant's motion to dismiss Plaintiff's hostile work environment claims.  To establish a hostile work environment under Title VII and the NYSHRL,[12] a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Littlejohn* v. *City of New York,* 795 F.3d 297, 320-21 (2d Cir. 2015) (quoting *Harris* v. *Forklift Sys.*, Inc., 510 U.S. 17, 21 (1993)).  In order to prove the existence of a hostile work environment, a plaintiff must show both (i) that the alleged behavior was "severe or pervasive enough to create an objectively hostile or abusive work environment"; and (ii) that the plaintiff "subjectively perceive[d] that environment to be abusive." *Duch* v. *Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (quoting *Feingold* v. *New York*, 366 F.3d 138, 150 (2d Cir. 2004)); *accord Fox* v. *Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019).

---

[12]      The New York State Legislature passed several amendments to the NYSHRL in June 2019, the effect of which was to render the standard for claims closer to the standard under the NYCHRL.  *See* A8421/S6577 (as amended by S6594/A8424). These amendments were signed into law by then-Governor Andrew Cuomo on or about August 12, 2019.  Significantly, however, these amendments only apply to claims that accrue on or after the effective date of October 11, 2019; they do not apply retroactively to Plaintiff's claims here.  *See Wellner* v. *Montefiore Med. Ctr.*, No. 17 Civ. 3479 (KPF), 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019).

A work environment is "abusive" when harassment has reached a certain qualitative level that is "sufficiently severe or pervasive [so as] to alter the conditions of the victim's employment." *Raniola* v. *Bratton*, 243 F.3d 610, 617 (2d Cir. 2001) (quoting *Meritor Savings Bank, FSB* v. *Vinson*, 477 U.S. 57, 67 (1986)). "On a motion for summary judgment, the question for the court is whether a reasonable factfinder could conclude, considering all the circumstances, that 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse.*'" *Schiano* v. *Quality Payroll Sys., Inc.*, 445 F.3d 597, 600 (2d Cir. 2006) (emphasis in original) (quoting *Whidbee* v. *Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000)). In making this determination, the court, assessing the totality of the circumstances, examines "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Cristofaro* v. *Lake Shore Cent. Sch. Dist.*, 473 F. App'x 28, 30 (2d Cir. 2012) (summary order) (quoting *Pucino* v. *Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010)).

"The incidents complained of 'must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Raspardo* v. *Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (quoting *Alfano* v. *Costello*, 294 F.3d 365, 374 (2d Cir. 2002)); *see also Alfano*, 294 F.3d at 380 (concluding that proffered incidents of harassment "were too few, too separate in time, and too mild ... to create an abusive working environment"); *see*

*generally Agosto* v. *N.Y.C. Dep't of Educ.*, 982 F.3d 86, 102 (2d Cir. 2020). While a single incident can suffice to substantiate a claim of hostile work environment, such an incident would have to be "extraordinarily severe." *Desardouin* v. *City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013). Furthermore, the plaintiff "must demonstrate that the conduct occurred because of" his protected status — here, Plaintiff's sex and sexual orientation — and also that a "specific basis exists for imputing the conduct that created the hostile environment to the employer." *Petrosino* v. *Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004).

### b.    Hostile Work Environment Claims Under the NYCHRL

Claims brought under the NYCHRL must be reviewed "independently from and 'more liberally' than their federal and state counterparts." *Loeffler* v. *Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (quoting *Williams* v. *N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 31 (1st Dep't 2009)); *see generally Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (noting that courts must "constru[e] the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible'" (quoting *Albunio* v. *City of New York*, 16 N.Y.3d 472, 477-78 (2011))). Hostile work environment claims brought pursuant to the NYCHRL require a plaintiff to show only that he was subjected to "'unequal treatment' *based upon membership in a protected class.*" *Fattoruso* v. *Hilton Grand Vacations Co.*, 873 F. Supp. 2d 569, 578 (S.D.N.Y. 2012) (emphasis in *Fattoruso*) (quoting

*Williams*, 872 N.Y.S.2d at 40), *aff'd*, 525 F. App'x 26 (2d Cir. 2013) (summary order).

"Even if the plaintiff establishes that [he] was treated 'less well' because of [his] [protected characteristic], defendants may assert 'an affirmative defense whereby [they] can still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences.'" *Mihalik*, 715 F.3d at 111 (internal quotation marks omitted) (quoting *Williams*, 872 N.Y.S.2d at 41). A court considering NYCHRL claims must consider "the totality of the circumstances" and "overall context in which the challenged conduct occurs." *Ladepo* v. *United Cerebral Palsy of N.Y.C., Inc.*, No. 15 Civ. 7026 (VSB), 2018 WL 4356726, at *11 (S.D.N.Y. Sept. 12, 2018) (quoting *Mihalik*, 715 F.3d at 113).  "Ultimately, however, as with Title VII, the NYCHRL 'is not a general civility code,' and where a plaintiff fails to demonstrate that the defendant's conduct was caused 'at least in part by discriminatory or retaliatory motive,' or the defendant demonstrates that the alleged conduct did not exceed 'petty slights or trivial inconveniences,' plaintiff's claim must fail."  *Ramirez* v. *Michael Cetta Inc.*, No. 19 Civ. 986 (VEC), 2020 WL 5819551, at *18 (S.D.N.Y. Sept. 30, 2020) (quoting *Mihalik*, 715 F.3d at 113).

### 2. Analysis

#### a. Overview

In support of his hostile work environment claims, Plaintiff references three conversations with Goodrich: (i) the occasion on which she overheard him

admiring a picture of a man wearing a romper, and questioned why the man in the photo was wearing "women's clothing"; (ii) the conversation in which she expressed disapproval over a man wearing a "very tight top" and "skin-tight jeans"; and (iii) her comment that if she had known that Plaintiff "lived an alternative lifestyle," she would have transferred one of his clients to another case worker.  (Pl. Opp. 13-14).  Additionally, both Plaintiff and his friend and former colleague, Tiffany Brown, attest in declarations that Goodrich referred to members of the LGBT community as "those men" and "those people." (Barney Decl. ¶ 5; Brown Decl. ¶¶ 10-11).  Plaintiff further asserts that Goodrich treated him differently from other co-workers, including by: (i) engaging in behavior that had the intent and effect of humiliating him, such as shouting at him in front of co-workers; (ii) requiring him to notify her by email when he was having lunch even if he was not leaving the office; (iii) requiring him to use public transportation to visit clients even where he had access to a car; (iv) questioning his truthfulness on two occasions; and (v) subjecting him to a performance review that was "manufactured" to produce an artificially low result.  (Pl. Opp. 13).

In Plaintiff's telling, Goodrich first learned of his sexual orientation upon overhearing him admire a picture of a man in a romper.  (Barney Dep. 129:24-130:11).  After this incident, her hostility towards Plaintiff "increased," culminating in his termination.  (Barney Decl. ¶¶ 18-26).  The Court views this chronology with some skepticism.  In particular, it is not evident to the Court that Goodrich would have necessarily learned of Plaintiff's identity merely upon

hearing him compliment a picture of a man wearing a romper.  *See Kulak*, 88
F.3d at 71 ("[C]onclusory statements, conjecture, or speculation by the party
resisting the motion will not defeat summary judgment." (citations omitted));
*accord Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010).  Moreover, Plaintiff
testified that his only discussion with Goodrich regarding his sexual orientation
took place later in his employment, when he was confronted about his client's
claim that he had not in fact visited her on the morning of June 5, 2017:

> Q.    Did you ever have a discussion with Ms. Goodrich
>        about your sexual orientation?
>
> A.    As far as when I told her that day when she said
>        that the client didn't — that I did not go to the
>        client's house, that was the extent of our
>        conversation.
>
> Q.    Other than the conversation which you allege
>        took place on June 9th, I believe, when you
>        discussed going to the client's house, was there
>        any other discussions you ever had with Ms.
>        Goodrich that pertained to your sexual
>        orientation?
>
> A.    Not mine, no.  Not me, personally."

(Barney Dep. 128:6-18).[13]  And it is unclear to the Court whether much of the
purportedly hostile conduct discussed in Plaintiff's submissions preceded or

---

[13]    This chronology is also in tension with Plaintiff's testimony that his client may have lied
about meeting with him on June 5, 2017, because her husband took issue with
Plaintiff's sexual orientation.  (*See* Barney Dep. 103:10-13).  Plaintiff attests that he is
an "openly gay man" and does not "hide [his] sexual orientation."  (Barney Decl. ¶ 6; *see
also* Barney Dep. 103:10-13 ("Q. Do you have any reason to believe the client knew of
your sexual orientation?  A. I don't hide it so I'm going to assume and say yes.")).  And
he testified that upon first meeting his client's husband, he inferred that her husband
"ha[d] an issue with [him] being gay and coming around," despite the fact that his
orientation had not been a subject of discussion.  (*See* Barney Dep. 100:3-15).  Yet
Plaintiff simultaneously maintains that Goodrich was unaware of this aspect of his
identity at the time she interviewed and hired him, and only became aware of it upon
hearing him compliment a picture of a man wearing a romper.  (*See id.* at 129:24-

post-dated this conversation with Goodrich.[14]  With these concerns in mind, the Court considers Plaintiff's proffered evidence of a hostile work environment.

### b.     The Court Grants Summary Judgment as to Plaintiff's Title VII and NYSHRL Hostile Work Environment Claims

The Court addresses each category of purportedly hostile conduct in turn, but to preview, finds that viewed cumulatively, it does not meet the requirements for a federal or state hostile work environment claim.  *First*, Plaintiff contends that he had three conversations with Goodrich during which she made offensive references to gender identity and sexual orientation.  (Pl. Opp. 14).  Defendant argues that (i) these comments were "sporadic" and "were made generally and were not even directed at [Plaintiff]" (Def. Br. 16-17), and (ii) Plaintiff's "subjective" understanding of these comments as expressing disapproval of gay men and "men who wear traditionally 'feminine' clothing" does not suffice to establish a hostile work environment claim that can withstand summary judgment (Def. Reply 6-7).  While the Court recognizes that Goodrich denies that these conversations ever took place (Goodrich Dep. 99:5-22), even construing the record in the light most favorable to Plaintiff, it finds that these comments, "while plainly inappropriate, 'were too

---

130:11).  The Court finds this unexplained inconsistency in Plaintiff's theory of the case to be troubling.

[14]     For example, in Plaintiff's declaration, he attests that "approximately two weeks" into his employment with HELP, Goodrich made a "critical comment" about a man walking by the HELP office in "a very tight top and very skin-tight jeans."  (Barney Decl. ¶¶ 7-10).  In Plaintiff's deposition, he testified that this comment post-dated his conversation with Goodrich during the week of June 5, 2017, in which he first disclosed his sexual orientation.  (Barney Dep. 136:4-19).  Plaintiff does not provide any indication of the timing of the romper photograph incident, which further hinders the Court's ability to understand the relationship between this incident and the other conduct alleged by Plaintiff.

few, too separate in time, and too mild ... to create an abusive working environment.'" *Kaplan* v. *N.Y. State Dep't of Lab.*, No. 18 Civ. 3629 (KPF), 2021 WL 1088463, at *10 (S.D.N.Y. Mar. 22, 2021) (quoting *Alfano*, 294 F.3d at 380 (2d Cir. 2002)) (collecting cases deeming a few isolated comments insufficient to sustain a hostile work environment claim); *see also Whidbee*, 223 F.3d at 69 ("Incidents that are few in number and that occur over a short period of time may fail to demonstrate a hostile work environment." (citations and internal quotation marks omitted)).  And even accepting Plaintiff's contention that Goodrich had only recently been made aware of his sexual orientation at the time she made these comments (Barney Dep. 129:24-130:11, 136:4-13) — a contention which, as noted above, the Court has reason to doubt — considering these remarks together, they are still insufficient to establish a hostile work environment.  Fatally, they "lack the pervasiveness, ridicule, or intimidation necessary to create a hostile work environment[.]"  *Mendez-Nouel* v. *Gucci Am., Inc.*, No. 10 Civ. 3388 (PAE), 2012 WL 5451189, at *10 (S.D.N.Y. Nov. 8, 2012).

Plaintiff argues that *Mendez-Nouel* is inapplicable, and distinguishes comments made to the plaintiff in that case "to the effect that 'You know what, I know you're gay inside.  You are so gay.  You just don't know it'" as "not objectively offensive because they do not inherently disparage the protected characteristic in question."  (Pl. Opp. 14 (quoting *Mendez-Nouel*, 2012 WL 5451189, at *8)).  However, the Second Circuit has found that even "derogatory language" used by a supervisor, coupled with "dismissive comments by

26

management" regarding the supervisor's behavior, the supervisor's "attempts to create a paper trail," and "intense scrutiny" of the plaintiff, were insufficient to meet the standard for a hostile work environment. *Nugent* v. *St. Luke's-Roosevelt Hosp. Ctr.*, 303 F. App'x 943, 945 (2d Cir. 2008) (summary order). As relevant here, the district court in *Nugent* acknowledged that the supervisor's "use of derogatory language to refer to patients and staff [was] plainly inappropriate," but determined nonetheless "as a matter of law, a supervisor's occasional use of sexist language does not create a hostile work environment." *Nugent* v. *St. Luke's/Roosevelt Hosp. Ctr.*, No. 05 Civ. 5109 (JCF), 2007 WL 1149979, at *17 (S.D.N.Y. Apr. 18, 2007) (collecting cases), *aff'd*, 303 F. App'x 943 (2d Cir. 2008) (summary order); *see also Brown* v. *Coach Stores, Inc.*, 163 F.3d 706, 713 (2d Cir. 1998) (determining that racist remarks made on occasion, including a remark directed at plaintiff, were not "sufficiently severe or pervasive"); *Pagan* v. *N.Y. State Div. of Parole*, No. 98 Civ. 5840 (FM), 2003 WL 22723013, at *6 (S.D.N.Y. Nov. 18, 2003) (finding that supervisor's use of racially derogatory language on five occasions did not create hostile work environment).

Moreover, Plaintiff does not indicate that these comments "unreasonably interfered" with his work performance. *See Cristofaro*, 473 F. App'x at 30. In particular, he does not "point to any evidence that [Goodrich's] isolated comments prevented [him] from completing [his] assignments." *Williams* v. *Geiger*, 447 F. Supp. 3d 68, 85-86 (S.D.N.Y. 2020). Thus, despite Plaintiff's subjective understanding of the comments, the Court finds that "no reasonable

employee would find the conditions of [his] employment *altered for the worse*,"
on the basis of Goodrich's comments alone.  *Id.* (alteration in *Williams*) (quoting
*Terry* v. *Ashcroft*, 336 F.3d 128, 149 (2d Cir. 2003)); *cf. Soto* v. *CDL (N.Y.) L.L.C.*,
No. 18 Civ. 5678 (KPF), 2020 WL 2133370, at *11 (S.D.N.Y. May 5, 2020)
("[A]lthough the Coordinator's statement may have been inappropriate or
lacked social tact, it was far too innocuous to lead a reasonable juror to believe
that it would have worsened the working conditions of a reasonable
employee.").[15]

   *Second*, Plaintiff asks the Court to consider comments made by Goodrich
that were not directed at him and/or not "personally witnessed" by him.  (Pl.
Opp. 15-18).  In particular, Plaintiff's briefing argues that the "'many'
comments heard by his coworker and relayed to [Plaintiff]" should be "counted
towards a hostile work environment."  (*Id.* at 15).  However, the record does not

---

[15]  Plaintiff refers the Court to several cases that only serve to illustrate the failings of his
hostile work environment claim.  (Pl. Opp. 17-18).  In *Philpott* v. *New York*, the plaintiff
alleged "ongoing and continuous" comments by his supervisor that were directly related
to his sexual orientation, including being told that he was "sensitive," "flamboyant," and
"frenetic," and with respect to his chemical dependency, "AIDS had to be managed, well
manage this yourself," and that "substance abuse was 'common' in the gay
community."  252 F. Supp. 3d 313, 317-18 (S.D.N.Y. May 3, 2017).  Similarly, in
*Roberts* v. *United Parcel Service, Inc.*, the court found that a supervisor's "continuing
discriminatory comments about plaintiff's sexual orientation, made over a number of
years, show[ed] adverse differential treatment," and that a jury could conclude that a
reasonable person "who repeatedly was the target of such comments ... and repeatedly
complained but found no recourse" would consider such comments "more than a trivial
inconvenience." 115 F. Supp. 3d 344, 371 (E.D.N.Y. 2015).  Finally, in *Daniel* v. *T & M
Protection Resources, LLC*, the plaintiff alleged both that his supervisor "frequently
called him a 'homo' and told him to 'man up, be a man'" and that the same supervisor
"brushed his genitalia against [the plaintiff's] buttocks ... one of the most severe forms
of sexual harassment."  689 F. App'x 1, 3 (2d Cir. 2017) (summary order) (internal
citation and quotation marks omitted).  The Court thinks it self-evident that the
conduct alleged in these cases is both more severe and more pervasive than that
recounted by Plaintiff.

reflect that "many" offensive or derogatory remarks were made outside of Plaintiff's presence and relayed to him by a coworker.  Plaintiff has merely submitted a single declaration from a friend and former colleague at HELP, Tiffany Brown, attesting: "I heard Ms. Goodrich make disapproving statements about 'those people' and 'those men.'  I understood these to be references to the LGBT community."  (Brown Decl. ¶¶ 10-11).  Brown's declaration does not indicate the frequency of those "disapproving statements," the circumstances in which those statements were made, or whether those statements were relayed to Plaintiff while he was employed by HELP.

While Plaintiff observes that the Second Circuit has held that "a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim[,]" *Whidbee*, 223 F.3d at 69 (first alteration in *Whidbee*) (citation omitted),[16] to find that Goodrich's disapproving statements were relevant to Plaintiff's subjective perception of his work environment, Plaintiff must demonstrate that he had some awareness that these comments were being made at the time. *See id.* at 71 (observing that "second-hand comments may be relevant" in analyzing a hostile work environment claim); *Schwapp* v. *Town of Avon*, 118

---

[16]     Plaintiff also refers the Court to the Second Circuit's decision in *Perry* v. *Ethan Allen, Inc.*, 115 F.3d 143, 150 (2d Cir. 1997), which held that "evidence of the general work atmosphere is relevant" to determining whether a plaintiff has established a hostile work environment claim.  (Pl. Opp. 15-16).  For the reasons discussed above, the Court finds that the Brown Declaration does not provide "evidence of the general work atmosphere." *Cf. Perry*, 115 F.3d at 151 (questioning the district court's decision not to allow defendant's non-party women employees testify about experiences of sexual harassment not witnessed by plaintiff).

F.3d 106, 111 (2d Cir. 1997) ("[T]he fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment."); *see also Leibowitz* v. *N.Y.C. Transit Auth.*, 252 F.3d 179, 190 (2d Cir. 2001) (recognizing that "remarks made outside a plaintiff's presence can be relevant to a hostile work environment claim," but holding nonetheless that plaintiff failed to prove a hostile work environment where she "was not herself a target of the alleged harassment, was not present when the harassment supposedly occurred, and did not even know of the harassment while it was ongoing"); *cf. Drouillard* v. *Sprint/United Mgmt. Co.*, 375 F. Supp. 3d 245, 264 (E.D.N.Y. 2019) (finding third-party testimony probative where non-parties testified that they witnessed supervisor using racial epithet in plaintiff's presence).

Here, neither Brown nor Plaintiff represents that Plaintiff was aware of any offensive comments made by Goodrich outside of his presence. Moreover, solely on the basis of Brown's conclusory attestation, the Court is unable to find, from an objective standpoint, that Goodrich's comments establish a material dispute of fact as to whether her hostility made Plaintiff's workplace severe and pervasive.[17] For similar reasons, Goodrich's "frequent references to

---

[17]    Plaintiff's case references on this point are again unavailing. Plaintiff contends that *Rivera* v. *Rochester Genesee Regional Transportation Authority*, 743 F.3d 11 (2d Cir. 2014) is "quite similar to the present case." (Pl. Opp. 16). In *Rivera*, a plaintiff testified that on at least five occasions, upon pulling into his employer's garage, his colleagues chanted slurs at him. 743 F.3d at 21. Plaintiff notes that the Second Circuit was "obliged to consider the [employees'] alleged uses of slurs 'cumulatively'" and also considered the corroborating deposition testimony of another plaintiff and non-party witnesses who provided evidence about hostile comments made *about* the plaintiff and another co-worker outside of his presence. (Pl. Opp. 16 (quoting *Rivera*, 743 F.3d at 21)). Here, Plaintiff does not allege any conduct comparable to the routine harassment to

'those people' and 'those men'" recalled by Plaintiff in his declaration but not discussed in his deposition (*see* Barney Decl. ¶ 5), are not sufficient to support a federal or state hostile work environment claim.  *See, e.g.*, *Howell* v. *Montefiore Med. Ctr.*, No. 13 Civ. 8505 (AT), 2016 WL 880373, at *9 (S.D.N.Y. Feb. 16, 2016) ("Although any slurs made, even if joking, can contribute to an 'abusive work environment[,]' these allegations alone cannot show that [plaintiff's] workplace was 'permeated with discriminatory intimidation, ridicule, and insult[,]' or that the conduct of [defendant's] employees was physically threatening [or] humiliating rather than 'merely an offensive utterance.'" (citations omitted)), *aff'd*, 675 F. App'x 74 (2d Cir. 2017) (summary order); *cf. Philpott* v. *State Univ. of N.Y.*, 805 F. App'x 32, 35 (2d Cir. 2020) (summary order) ("[T]he available evidence shows that any discriminatory comments allegedly made by his supervisor and a coworker — including comments about which [the plaintiff] could identify no specifics as to timing or context or which he heard indirectly from third parties — were made inconsistently and sporadically.  In other words, the record evidence does not support a finding that these isolated comments, assuming they were made,

---

in *Rivera*.  Moreover, there is no evidence in the record that Goodrich made any hostile comments about Plaintiff outside of his presence.  Rather, there is only the Brown Declaration, attesting that Goodrich made references to "those people" and "those men." (Brown Decl. ¶¶ 10-11).  This is in sharp contrast to the routine slurs, corroborating deposition testimony of non-party witnesses regarding comments made about the plaintiff outside of his presence, and "detailed testimony about extensive bullying and physical harassment" by the defendant's employees that led the Second Circuit in *Rivera* to find that "[a] reasonable jury could conclude that the alleged incidents of harassment in the record, including the slurs, constituted more than mere offensive utterances."  743 F.3d at 21-22 (citation, internal quotation marks, and alteration omitted).

were 'sufficiently continuous and concerted' such that they meet the threshold of pervasiveness." (citation omitted)).[18]

*Third*, Plaintiff argues that in light of Goodrich's discriminatory statements, "facially neutral incidents of disparate treatment" are also relevant to determining the existence of a hostile work environment.  (Pl. Opp. 18-19). By "facially neutral," the Court understands Plaintiff to be referring to certain behaviors by Goodrich discussed in Plaintiff's declaration and deposition, including: (i) requiring him to email her each day to notify her that he was going to lunch, when no other employees were required to do this; (ii) berating him in front of colleagues on several occasions; (iii) harshly criticizing his work performance; and (iv) requiring him to take public transportation to client meetings even though he had access to a car.  (Barney Decl. ¶¶ 18-26, 38; Barney Dep. 112:21-25, 127:13-14, 189:12-22).[19]  Plaintiff also asserts that Goodrich "baselessly questioned his truthfulness on two occasions,"[20] and

---

[18]    Moreover, the Court observes that Plaintiff, when asked in his deposition whether there were any "other comments or remarks" made by Goodrich "which pertained to [his] sexual orientation," responded, "I believe that's it."  (Barney Dep. 138:8-12).  The Court is thus disinclined to consider Goodrich's alleged references to "those men" or "those people," given that Plaintiff opted not to mention these comments during his deposition. *See Kennedy*, 570 F. App'x at 84.

[19]    As noted above, *see supra* note 3, these contentions have been expanded upon in Plaintiff's declaration submitted in connection with his opposition briefing.  (*See* Barney Decl. ¶¶ 18-26, 38).

[20]    While Plaintiff does not identify these two occasions, the Court understands them to include Plaintiff's exchanges with Goodrich in June 2017 in which she indicated that he had lied about an unscheduled visit with a client.  (Barney Dep. 99:12-15; Weiss Decl., Ex. A at P00126-27).  Elsewhere in Plaintiff's briefing, he asserts that Goodrich made a "baseless accusation" that he had lied about an "emergency call" with his mother.  (Pl. Opp. 24).  However, as discussed *infra*, in Plaintiff's own recounting of that conversation in his deposition, he made no suggestion that Goodrich had accused him of lying about the call.  (Barney Dep. 68:16-19 (indicating that Goodrich was "fine" with his explanation, and said: "Okay, understand, but that's not allowed.  This is a red flag. I'm going to make a note to file.  You are not in trouble, but just be mindful.")).  Once

"subjected him to a performance review that was manufactured by her to produce an artificially low result."  (Pl. Opp. 18).

On its own, such facially neutral conduct would not support a hostile work environment claim.  *See, e.g.*, *Salerno* v. *Town of Bedford, NY*, No. 05 Civ. 7293 (SCR), 2008 WL 5101185, at *8 (S.D.N.Y. Dec. 3, 2008) ("Allegations of negative job evaluations or excessive reprimands are insufficient to establish a hostile environment claim.").  However, Plaintiff refers the Court to a Second Circuit decision emphasizing that "facially neutral incidents may be included among the 'totality of the circumstances' that courts consider in any hostile work environment claim," and observing that "[c]ircumstantial evidence" that facially neutral incidents "were part of a pattern of discrimination" may consist of evidence that "the same individual engaged in multiple acts of harassment, some [based on a protected characteristic] and some not."  *Kaytor* v. *Elec. Boat Corp.*, 609 F.3d 537, 547-48 (2d Cir. 2010) (citations and internal quotation marks omitted).  More recently, the Second Circuit has reaffirmed: "Our case law is clear that when the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile work environment claim."  *Rasmy* v. *Marriott Int'l, Inc.*, 952 F.3d 379, 388 (2d Cir. 2020).

Even were the Court to consider this conduct in assessing Plaintiff's federal and state hostile work environment claims, it would find only that such

---

again, the Court will not consider Plaintiff's statements that contradict his prior deposition testimony.  *See Kennedy*, 570 F. App'x at 84.

conduct "may have created a tense and unpleasant atmosphere in which to work," but nonetheless was "not severe or pervasive enough to be actionable." *Kearse* v. *ATC Healthcare Servs.*, No. 12 Civ. 233 (NRB), 2014 WL 958738, at *8 (S.D.N.Y. Mar. 11, 2014) (finding plaintiff had not demonstrated a hostile work environment where he alleged, *inter alia*, that his supervisor repeatedly reprimanded him and "stated harsh things" about his work performance to other employees, limited his paid time off, and kept him past the time when he needed to leave).  For the most part, Plaintiff seeks "to transform [a] laundry list of slights and inconveniences into an actionable hostile work environment claim[.]" *Harewood* v. *N.Y.C. Dep't of Educ.*, No. 18 Civ. 5487 (KPF), 2021 WL 673476, at *13 (S.D.N.Y. Feb. 22, 2021), *appeal filed*, No. 21-584 (2d Cir. Mar. 12, 2021).  At base, Plaintiff asserts that Goodrich subjected him to excessive scrutiny and was both overly and openly critical, and at times Plaintiff found this criticism humiliating.  But as noted above, the Second Circuit has found that "intense scrutiny" by a supervisor, even where accompanied by "derogatory language" and "attempts to create a paper trail," does not amount to a hostile work environment.  *See, e.g.*, *Nugent*, 303 F. App'x at 945; *see also Harvin* v. *Manhattan & Bronx Surface Transit Operating Auth.*, 767 F. App'x 123, 128 (2d Cir. 2019) (summary order) (holding that "[r]un-of-the-mill workplace conflicts, troubling though they may be, do not rise to the level of an objectively hostile workplace," and deeming insufficient allegations that supervisors were rude and hostile on various occasions, including two occasions where they may have referred to plaintiff's disability); *Nweze* v.

34

*N.Y.C. Transit Auth.*, 115 F. App'x 484, 485 (2d Cir. 2004) (summary order) (upholding district court determination that supervisor's yelling at employee and requests for errands, "even if … racially motivated," were insufficient to constitute a hostile work environment); *Faison* v. *Leonard St., LLC*, No. 08 Civ. 2192 (PKC), 2009 WL 636724, at *4 (S.D.N.Y. Mar. 9, 2009) ("[A]llegations of persistent shouting and a display of poor temperament are insufficient to state a plausible hostile-environment claim.").[21]

"The law does not require an employer to like his employees, or to conduct himself in a mature or professional manner, or … even to behave reasonably and justly when he is peeved."  *Sandler* v. *Montefiore Health Sys., Inc.*, No. 16 Civ. 2258 (JPO), 2018 WL 4636835, at *10 (S.D.N.Y. Sept. 27, 2018) (ellipses in *Sandler*) (citation omitted) (finding comments relating to plaintiff's Jewish identity, even where "supplement[ed]" by "facially neutral harsh treatment," insufficient to sustain a federal or state hostile work environment claim).  Goodrich's conduct, "even if occasionally insulting or even demeaning, 'was not physically threatening, was not particularly severe, and did not alter the conditions of plaintiff's employment, create an abusive working environment, or unreasonably interfere with plaintiff's work

---

[21]    The Court notes that Goodrich has offered explanations for some of this conduct.  As to Plaintiff's contention that Goodrich required him to take public transportation to client meetings (Barney Decl. ¶ 18), Goodrich has explained that she required Plaintiff to take mass transportation on one occasion, as he was making a client visit with a co-worker who indicated that she was new to driving and was uncomfortable taking her car on the visit (Goodrich Dep. 98:13-25).  She has also represented that she required all of her supervisees to inform her when they were leaving the building "for safety reasons."  (*Id.* at 91:4-8).

performance.'" *Id.* (quoting *Petrisch* v. *HSBC Bank USA, Inc.*, No. 07 Civ. 3303 (KAM) (JMA), 2013 WL 1316712, at *16 (E.D.N.Y. Mar. 28, 2013)).  For these reasons, Plaintiff's federal and state hostile work environment claims do not survive summary judgment.

> ### c.     The Court Denies Summary Judgment as to Plaintiff's NYCHRL Hostile Work Environment Claim

That said, Plaintiff's hostile work environment claim survives under the more forgiving NYCHRL standard.  Under this standard, Plaintiff must establish that he was subjected to "'unequal treatment' based upon membership in a protected class."  *Fattoruso*, 873 F. Supp. 2d at 578 (emphasis omitted).  As discussed further below, the Court acknowledges that a factual dispute exists as to whether Plaintiff was terminated due to his sexual orientation.  In so doing, the Court "has already determined that a jury could conclude [that the plaintiff] was treated 'less well' on account of that identity." *Sandler*, 2018 WL 4636835, at *11.  The question remaining in the hostile work environment analysis is therefore whether the "conduct complained of" merely consisted of "petty slights and trivial inconveniences."  *Mihalik*, 715 F.3d at 111.

Plaintiff contends that during a six-week period, he had three conversations with Goodrich during which she made offensive references to gender identity and sexual orientation.  (Pl. Opp. 13-14).[22]  "Though the

---

[22]    Both Plaintiff and Brown contend that during this same timeframe, Goodrich made additional comments referring to either gay men or members of the LGBT community as "those men" and "those people."  (Barney Decl. ¶ 5; Brown Decl. ¶¶ 10-11).  However, as discussed in connection with Plaintiff's federal and state hostile work environment claims, the Court is disinclined to consider these comments, given the conclusory

NYCHRL is not a 'general civility code,' even a single comment can give rise to liability if it suggests discrimination." *Doran* v. *N.Y. State Dep't of Health Off. of Medicaid Inspector Gen.*, No. 15 Civ. 7217 (PKC), 2019 WL 4735484, at *26 (S.D.N.Y. Sept. 27, 2019) (finding that plaintiff's NYCHRL claim survived summary judgment based on supervisor's "treatment" of plaintiff and "multiple comments" about plaintiff's accent).  While Goodrich's comments do not rise to the level of "severe or pervasive," the Court cannot find that they are merely "petty slights or trivial conveniences."  *See, e.g.*, *DeLuca* v. *Sirius SM Radio, Inc.*, No. 12 Civ. 8239 (CM), 2017 WL 3671038, at *20-21 (S.D.N.Y. Aug. 7, 2017) (determining that only plaintiff's NYCHRL claim survived summary judgment where she testified that her supervisor "called her a 'dyke,' disparagingly called her work 'gay,' and referred to another individual as a 'faggot,'" and that she "heard second-hand that he called his own supervisor a 'faggot'"); *Philip* v. *Gtech Corp.*, No. 14 Civ. 9261 (PAE), 2016 WL 3959729, at *24-25 (S.D.N.Y. July 20, 2016) (finding that single offensive comment overheard by plaintiff, combined with "secondhand evidence of racial basis," did not meet the Title VII and NYSHRL standard, but was sufficient to sustain an NYCHRL hostile work environment claim).

In sum, Defendant's motion for summary judgment is granted as to Plaintiff's hostile work environment claims under Title VII and the NYSHRL, and denied as to his hostile work environment claim under the NYCHRL.

---

nature of Brown's declaration, and the fact that Plaintiff did not make any mention of them in his deposition.

**C.    The Court Grants in Part and Denies in Part Defendant's Motion for Summary Judgment as to Plaintiff's Unlawful Termination and Retaliation Claims**

**1.    Applicable Law**

**a.    Unlawful Termination and Retaliation Claims Under Title VII and the NYSHRL**

Plaintiff also brings unlawful termination and retaliation claims under Title VII, the NYSHRL, and the NYCHRL.  Unlawful termination and retaliation claims under Title VII and the NYSHRL are analyzed using the burden-shifting framework adopted in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973). *See, e.g.*, *Lenzi* v. *Systemax, Inc.*, 944 F.3d 97, 107-08 (2d Cir. 2019); *Patterson* v. *County of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004).  Under this framework,

> the plaintiff bears the initial burden of establishing a *prima facie* case of [unlawful termination or retaliation]. If the plaintiff does so ... the defendant [must] articulate some legitimate, nondiscriminatory reason for its action.  If such a reason is provided, plaintiff ... may still prevail by showing ... that the employer's determination was in fact the result of [discrimination or retaliation].

*Holcomb* v. *Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (citation and internal quotation marks omitted).

To establish a *prima facie* case of unlawful termination, a plaintiff must show: (i) that he was qualified for the job; (ii) that he was within the protected group, (iii) that he was either actually or constructively discharged, and (iv) that the discharge occurred under circumstances giving rise to an inference of discrimination.  *See Flaherty* v. *Metromail Corp.*, 59 F. App'x 352, 354 (2d Cir. 2002) (summary order); *Dister* v. *Cont'l Grp., Inc.*, 859 F.2d 1108, 1114-15

38

(2d Cir. 1988).  And to establish a *prima facie* claim of retaliation, a plaintiff must show: (i) he engaged in protected activity; (ii) the defendant was aware of that activity; (iii) he suffered a materially adverse action; and (iv) there was a causal connection between the protected activity and that adverse action.  *Kelly* v. *Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam).  "The burden of establishing a *prima facie* case is not onerous, and has been frequently described as minimal."  *Walsh* v. *N.Y.C. Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016) (citation omitted).

The *prima facie* case requirement does not require that the plaintiff provide "evidence sufficient to show discriminatory motivation," but rather creates "a temporary presumption of discriminatory motivation, shifting the burden of production to the employer and requiring the employer to come forward with its justification for the adverse employment action against the plaintiff."  *Littlejohn*, 795 F.3d at 307 (internal quotation marks omitted).  If a plaintiff establishes a *prima facie* case of unlawful termination or retaliation, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory or non-retaliatory reason for the challenged employment decision.  *See Patterson*, 375 F.3d at 221.  "Defendants' burden at this stage is not to prove nondiscrimination.  Instead, defendants must introduce evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action."  *Albuja* v. *Nat'l Broad. Co. Universal*, 851 F. Supp. 2d 599, 610 (S.D.N.Y. 2012) (internal quotation marks omitted).  If the defendant articulates legitimate, nondiscriminatory reasons for

the adverse action, "the presumption of discrimination vanishes and the burden shifts back to the plaintiff to come forward with evidence that the employer's proffered explanations were merely pretextual and that the actual motivations more likely than not were discriminatory." *Abdu-Brisson* v. *Delta Air Lines, Inc.*, 239 F.3d 456, 469 (2d Cir. 2001); *accord Patterson*, 375 F.3d at 220. To meet this standard, the plaintiff "must establish 'circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's employment decision was more likely than not based in whole or in part on discrimination.'" *Sullivan* v. *N.Y.C. Dep't of Investigation*, 163 F. Supp. 3d 89, 99 (S.D.N.Y. 2016) (quoting *Kirkland* v. *Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014)).

### b. Unlawful Termination and Retaliation Claims Under the NYCHRL

As noted above, claims brought under the NYCHRL must be reviewed "independently from and 'more liberally' than their federal and state counterparts." *Loeffler*, 582 F.3d at 278 (quoting *Williams*, 872 N.Y.S.2d at 31).[23] To establish a discrimination claim under the NYCHRL, a plaintiff need

---

[23]    While it is "unclear whether, and to what extent, the *McDonnell Douglas* burden-shifting analysis has been modified for NYCHRL claims," *Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F. 3d 102, 110 n.8 (2d Cir. 2013), more recent decisions from the Second Circuit have suggested a separate analysis. *See, e.g.*, *Gachette* v. *Metro-N. Commuter R.R. Co.*, 804 F. App'x 65, 67 (2d Cir. 2020) (summary order) ("Under the NYCHRL — which must be analyzed separately from state and federal law claims — Gachette must demonstrate, by a preponderance of evidence, that he 'has been treated less well than other employees' because of his race or national origin." (quoting *Mihalik*, 715 F.3d at 110)); *Emengo* v. *Stark*, 774 F. App'x 26, 29 (2d Cir. 2019) (summary order) ("Emengo's discrimination claims, aside from those brought under the NYCHRL, proceed under the burden-shifting analysis set forth in *McDonnell Douglas*[.]" (citing *Garcia* v. *Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013); *Lore* v. *City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012))).

only "show differential treatment — that [he] was treated 'less well' — because of a discriminatory intent." *Mihalik*, 715 F.3d at 110; *accord Kops* v. *PPM Am., Inc.*, No. 15 Civ. 1584 (GBD), 2016 WL 7188793, at *5 (S.D.N.Y. Dec. 5, 2016). An employer may present a legitimate, non-discriminatory reason for its actions, but it is entitled to summary judgment "only if the record established as a matter of law that discrimination played no role in its actions." *Kops*, 2016 WL 7188793, at *5. To prevail on a retaliation claim under the NYCHRL, a plaintiff must demonstrate that "[he] took an action opposing [his] employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (internal citations omitted).

### 2.   Analysis

#### a.   Plaintiff Has Established a Material Dispute of Fact as to All of His Unlawful Termination Claims

As noted above, to establish a *prima facie* case of unlawful termination, a plaintiff must show that: (i) he was qualified for the job; (ii) he was within the protected group; (iii) he was either actually or constructively discharged, and (iv) the discharge occurred under circumstances giving rise to an inference of discrimination. *See Flaherty*, 59 F. App'x at 354. "[A]n inference of discriminatory intent may be established by, *inter alia*, 'the employer's ... invidious comments about others in the employee's protected group; or ... the sequence of events leading to the plaintiff's discharge.'" *Sassaman* v. *Gamache*,

41

566 F.3d 307, 312 (2d Cir. 2009) (ellipses in *Sassaman*) (quoting *Abdu-Brisson*, 239 F.3d at 468).[24]

Here, the parties have different views as to whether Plaintiff has met his burden on the fourth prong.  Defendant argues that there is neither direct nor

---

[24]    An inference of discrimination also can be drawn when "similarly situated" individuals were "treated differently."  *Shumway* v. *United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997); *see also Abdu-Brisson* v. *Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) ("[A] showing of disparate treatment … is only one way to discharge [the] burden [of establishing the inference of discriminatory intent].").  Plaintiff asserts that Goodrich "treated employees who were not gay men differently to how she treated [him]," and in support, cites to the Brown Declaration.  (Pl. 56.1 ¶ 66).  In her declaration, Brown attests that she has not seen Goodrich treat any employee "in the same manner that she treated [Plaintiff]" (Brown Decl. ¶ 38), and that Goodrich did not speak "in an aggressive or hostile manner" or "raise her voice" with another employee, Kowsillia Jattan, who started as a Clinical Social Worker in the New Beginnings program shortly before Plaintiff's termination (*id.* at ¶¶ 35-37).

The Second Circuit has explained:

> While similarly situated employees who receive different treatment can be evidence of discrimination, the employees "must be similarly situated in all material aspects."  To satisfy the "all material respects" requirement, a plaintiff must show that similarly situated employees "engaged in comparable conduct," meaning there is a "reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases," such that "the conduct for which the employer imposed discipline was of comparable seriousness" to the conduct of the similarly situated but undisciplined employees.

*Jordan* v. *United Health Grp. Inc.*, 783 F. App'x 31, 33 (2d Cir. 2019) (summary order) (citations omitted).  Here, Plaintiff does little to establish that Jattan was similarly situated to him, aside from submitting that she was a fellow Clinical Social Worker in the New Beginnings Program.  (Brown Decl. ¶ 35).  Importantly, there is no evidence before the Court that Jattan had similar disciplinary issues that were handled differently by Goodrich.  Plaintiff merely asserts that both Brown and Jattan had at times left the HELP "office space in order to have a private conversation … without being subjected to discipline."  (*See* Barney Decl. ¶ 29).  But there is no indication that there were concerns about Jattan's tardiness, truthfulness, or compliance with the home visit policy.  *See Marseille* v. *Mount Sinai Health Sys., Inc.*, No. 18 Civ. 12135 (VEC), 2021 WL 3475620, at *5 (S.D.N.Y. Aug. 5, 2021) ("Although Plaintiff identified by name many coworkers whom she alleges were treated better than she was, the record is devoid of any evidence of a [similarly-situated] colleague whose documentation was reviewed differently than Plaintiff's, or who was not criticized or disciplined for documentation and treatment lapses similar to Plaintiff's." (internal citations omitted)).  The Court thus cannot find that Plaintiff has established a *prima facie* case of unlawful termination merely on the basis of contentions in his and Brown's declarations.

circumstantial evidence showing that Plaintiff's termination was motivated by a hostility to his sex or sexual orientation.  (Def. Br. 11).  And even if Plaintiff has met his burden, Defendant argues that it had a legitimate non-pretextual reason for terminating his employment, and that Plaintiff is unable to show that Defendant's reason for terminating him was pretextual.  (*Id.* at 11-14).  Plaintiff responds that he has raised a genuine issue of material fact regarding the reason for his termination — in particular, whether Goodrich would not have provided him with a poor performance evaluation if not for her "discriminatory animus."  (Pl. Opp. 23-27).

Plaintiff largely attempts to establish his *prima facie* case by calling into question Goodrich's testimony and accusing her of fabrication.  (Pl. Opp. 23-24).  In particular, Plaintiff now contends that Goodrich "fabricated" that she had a phone call with a client where the client denied meeting with Plaintiff on June 5, 2017.  (*Id.* at 10, 24).  Plaintiff further argues that Goodrich's alleged increased hostility following the romper discussion makes evident that her decision to terminate him was motivated by discriminatory animus.  (*Id.* at 24).  While the Court is unpersuaded by much of what Plaintiff offers in favor of his *prima facie* case, it nonetheless finds that he has met his "minimal" burden.  *Walsh*, 828 F.3d at 75.

At the outset, the Court does not find compelling Plaintiff's accusation — offered without any support, and raised for the first time on this motion — that Goodrich has engaged in falsehoods.  *See Harewood*, 2021 WL 673476, at *12 ("[A]ssertions without evidence are an inadequate basis to raise a triable issue

of fact.").[25]  Similarly, Plaintiff's conclusory assertion that Goodrich's hostility increased upon learning of his sexual orientation is also insufficient to establish a material dispute of fact.  As discussed above, the Court is not willing to readily accept Plaintiff's assertion that Goodrich first learned of his sexual orientation upon overhearing him compliment a photo of a man wearing a romper.  *Cf. Gottlieb* v. *Cnty. of Orange,* 84 F.3d 511, 518 (2d Cir. 1996) ("[T]he opposing party … cannot defeat the [summary judgment] motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  The motion 'will not be defeated merely … on the basis of conjecture or surmise.'" (citations omitted)); *Eka* v. *Brookdale Hosp. Med. Ctr.*, 247 F. Supp. 3d 250, 270 (E.D.N.Y. 2017) ("[Plaintiff's] own conclusory statements … cannot give rise to an inference of discrimination.") (collecting cases).  That said, if Goodrich first learned of Plaintiff's sexual orientation at some point during his employment — whether through the romper discussion, or the conversation about his purported June 5, 2017 client visit — and then terminated him within a few weeks, such "temporal proximity" could give rise to an inference of discrimination.  *See Hardekopf* v. *Sid Wainer & Son,* No. 02 Civ. 3251 (LAP), 2004 WL 2199502, at *6 (S.D.N.Y. Sept. 29, 2004) ("[T]he temporal proximity

---

[25]    The Court observes that neither party appears to have deposed Plaintiff's client, which might have resolved any questions as to whether Goodrich falsified her call with the client.  While Plaintiff asserts that "the client, had she been consulted, would have told the truth," and that "it is Goodrich who is lying" (Barney Decl. ¶ 73), there is no indication that Plaintiff endeavored to consult the client during discovery.  Having forgone this line of inquiry, Plaintiff's contention that "there were no witnesses to this alleged phone call" is not persuasive.

between Plaintiff's announcement of her [protected status] and her termination is such that an inference of discrimination on the basis of [that status] is raised.") (collecting cases); *accord Saraf* v. *W. Publ'g Corp.*, No. 16 Civ. 1425 (VSB), 2018 WL 7107266, at *6 (S.D.N.Y. Dec. 20, 2018).  Given the temporal proximity between Goodrich's alleged discovery of Plaintiff's sexual orientation and Plaintiff's termination, the Court finds that Plaintiff has raised an inference of discrimination.[26]

The Court now turns to whether Defendant has provided a legitimate, non-discriminatory reason for Plaintiff's termination.  *See Patterson*, 375 F.3d at 221.  Defendant argues that Plaintiff was terminated due to his "troubling behavior," including "repeated tardiness," "not giv[ing] a straight answer as to where he was on several … occasions," "visit[ing] a client's home without authorization from his supervisor[,]" and "[w]hen questioned about [his client's denial that Plaintiff went to her home], bec[oming] enraged and in a most unprofessional manner accus[ing] the client of lying[.]"  (Def. Br. 11-12).  Defendant has established that Plaintiff committed various infractions early in his employment, which, when considered in their totality, provided Defendant with a legitimate reason for Plaintiff's termination.  Moreover, Plaintiff himself does not dispute certain of these issues, including that he arrived at the HELP

---

[26]    Defendant does not argue that the "same actor inference" is applicable here, and thus the Court does not address it.  *See Carlton* v. *Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) ("When the same actor hires a person already within the protected class, and then later fires that same person, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." (citation and internal quotation marks omitted)).

office late on two occasions (Pl. 56.1 ¶¶ 27, 31), and that he left the office in the middle of the day to take an "emergency telephone call" and went to the grocery store without first informing Goodrich of the reason for his absence (*id.* at ¶ 26). He also does not dispute that — under his telling of the events of the morning of June 5, 2017 — he made an unscheduled and unapproved home visit to a client, which type of visits he recognizes were "generally discouraged." (Barney Decl. ¶¶ 46-47, 60; *see also* Policy and Procedures for HELP USA's Home Visits (stating that there must "always" be "no less than two staff members at all times conducting home visits," and that the "only exception" is "a written approval from the Program Director")).[27]  As Defendant has provided a "performance-based reason" for the decision to terminate Plaintiff, it is "relieved of any presumption of discrimination," and the burden shifts back to Plaintiff to demonstrate that Defendant's proffered reasons were a pretext for

---

[27] Plaintiff does dispute whether it was appropriate for him to fill out the date of the release form on his client's behalf. (Pl. 56.1 ¶ 36). In support, he has submitted a five-page Expert Report from Dr. Adele Weiner, Ph.D., L.C.S.W. (Dkt. #51-8), expressing the opinion that Plaintiff's transcription of an incorrect date on the release form and his unapproved visit with his client "do not violate any ethical standards of social work and should have resulted in verbal correction." (*Id.* at ¶ 3). In her report, Dr. Weiner observes that: "It is acceptable for a social worker to date a form on behalf of a client as part of this preparation [of forms]." (*Id.* at ¶ 22). She further submits that: "It is my professional opinion that [Plaintiff] did not receive adequate training on the proper use of Release of Information forms." (*Id.* at ¶ 46). However, Dr. Weiner's report does not address other issues that Defendant argues gave it cause for concern regarding Plaintiff's performance, including Plaintiff's tardiness and unexplained absences. Neither does Dr. Weiner's report discuss the more significant issue of Plaintiff's truthfulness raised by the client's denial that she had met with him on June 5, 2017.

While Plaintiff does argue that his June 5, 2017 client meeting was in compliance with HELP's Home Visits Policy, as he met with the client outside her building (Pl. 56.1 ¶ 20), the Court does not read the Policy to provide any such exception for unapproved visits (*see* Policy and Procedures for HELP USA's Home Visits at D000060-61; *see also* Goodrich Dep. 46:20-23 (indicating that a client visit can be held "one-on-one" if "conducted outside, *let's say a park or a fast-food place*" (emphasis added))).

discrimination.  *See Mitchell* v. *Metro. Transit Auth. Cap. Constr. Corp.*, No. 16 Civ. 3534 (KPF), 2018 WL 3442895, at *13 (S.D.N.Y. July 17, 2018); *see also Fall* v. *N.Y. State United Tchrs.*, 289 F. App'x 419, 421 (2d Cir. 2008) (summary order) (determining that burden shifts to plaintiff where defendant "cited poor job performance as the reason for [plaintiff's] dismissal, and the record is replete with evidence supporting that legitimate basis for termination").

In an effort to discharge this burden, Plaintiff argues that Defendant's proffered non-pretextual basis for his termination is "undermine[d]" by his allegations that Goodrich's hostility increased once she overheard him admiring a picture of a man in a romper, and, further, that her "baseless accusation" that he lied about the "emergency call" with his mother demonstrates that she was already seeking justification for his termination. (Pl. Opp. 24).  The Court is again unpersuaded by a number of Plaintiff's arguments, but ultimately finds that he has established a material dispute of fact as to whether Defendant's reason for his termination was pretextual.

*First*, as discussed above, the Court is not convinced that the romper incident necessarily precipitated Goodrich's discovery of Plaintiff's sexual orientation and her resulting alleged discriminatory conduct.  Plaintiff's argument that Goodrich's hostility increased upon learning of his sexual orientation — and that she engaged in harassment, and preemptively sought justification for his termination — is entirely based upon assumptions that are not borne out by the record.  *Second*, and more fatally, Plaintiff's assertion that Goodrich made a "baseless accusation" that he lied about the emergency call

about his mother is contradicted by his own deposition testimony, in which he indicated that she merely said: "Okay, understand, but that's not allowed. This is a red flag. I'm going to make a note to file. You are not in trouble, but just be mindful." (Barney Dep. 68:16-19). Plaintiff's unsupported assertions fail to establish a triable issue of fact.

In connection with his hostile work environment arguments, Plaintiff contends that Goodrich "manufactured" his performance review to produce an artificially low result. (Pl. Opp. 13, 19). It is this contention that changes the outcome of the Court's burden-shifting analysis. The Court understands Plaintiff to rely upon Goodrich's June 15, 2017 email to Nicole Richards, enclosing a draft of her 30-day probationary period evaluation of Plaintiff, and asking, presumably in reference to Plaintiff's score: "Do you think it needs to be much lower?" (Weiss Decl., Ex. 1 at D000223). When asked about this email in her deposition, Goodrich was unable to recall what she meant by this query. (Goodrich Dep. 133:8-11 ("Q. But when it says, 'Do you think it needs to be much lower,' what is that talking about? A. I don't recall. I don't recall.")). Interpreting this email in the light most beneficial to Plaintiff, and taking into account Goodrich's comments discussed in connection with Plaintiff's hostile work environment claims, the Court finds that the email does raise a genuine dispute of fact as to whether Goodrich intentionally gave Plaintiff a negative performance evaluation. *See Chertkova* v. *Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 85, 93 (2d Cir. 1996) (finding it "plausible" that defendant issued a negative performance report "aimed at rationalizing the plaintiff's termination" where

48

one of plaintiff's immediate supervisors was asked to rewrite her initial evaluation because it was deemed "too good").[28]  Particularly given the Court's responsibility to be cautious in its use of summary judgment in employment discrimination cases, *see Goryznski* v. *JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010), and giving Plaintiff the benefit of every inference, the Court finds that Plaintiff has met his burden of establishing pretext.  The Court declines to grant summary judgment on Plaintiff's unlawful termination claims.[29]

### b.   Plaintiff Has Failed to Establish a Material Dispute of Fact as to His Retaliation Claims

Lastly, the Court addresses Plaintiff's retaliation claims.  Retaliation claims under Title VII are analyzed using the aforementioned *McDonnell Douglas* burden-shifting framework.  *See Lenzi*, 944 F.3d at 112.  To state a claim of retaliation under Title VII and the NYSHRL, Plaintiff must allege that: (i) he engaged in protected activity; (ii) Defendant was aware of that activity; (iii) he suffered a materially adverse action; and (iv) there was a causal connection between the protected activity and that adverse action.  *Kelly*, 716 F.3d at 14.  To prevail on a retaliation claim under the NYCHRL, Plaintiff must show that "[he] took an action opposing [his] employer's discrimination ... and

---

[28]   That said, the fact that the performance review occurred shortly after the conversation in which Plaintiff informed Goodrich of his sexual orientation would not be enough to discharge Plaintiff's burden.  *Yoselovsky* v. *Associated Press*, 917 F. Supp. 2d 262, 281 (S.D.N.Y. 2013) ("While timing alone may be a basis for establishing a *prima facie* case, it is not enough to establish pretext at the third stage of the *McDonnell Douglas* analysis.") (collecting cases).

[29]   As the Court has found that Plaintiff's unlawful termination claims survive summary judgment according to the more stringent standard imposed by Title VII, the Court need not separately analyze his NYCHRL claim.

that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (internal citations omitted).

Defendant argues that Plaintiff has not established a *prima facie* case of retaliation because he did not engage in any protected conduct.  (Def. Br. 8-10). Specifically, Defendant submits that Plaintiff's June 12, 2017 email to Farrell did not constitute a complaint, and Plaintiff did not otherwise engage in any protected activity that might give rise to a retaliation claim.  (*Id.* at 9-10 (discussing Zoldessy Decl., Ex. Q (June 12, 2017 email from Plaintiff to Farrell asking: "Do you have a block of free time this week for you and I to have a meeting regarding supervision?"))).  Plaintiff asserts that this email followed his conversation with Goodrich in which she allegedly made a comment about his "alternative lifestyle," and that when Goodrich learned about the email from Farrell, she understood the email to be a complaint about her discriminatory comments.  (Pl. Opp. 20; *see also* Barney Decl. ¶¶ 78-87).

An employee's complaint may qualify as protected activity where (i) the employee "had a good faith, reasonable belief that [he] was opposing an employment practice made unlawful by Title VI," and (ii) the employer "understood, or could reasonably have understood, that the [employee's] opposition was directed at conduct prohibited by Title VII."  *Kelly*, 716 F.3d at 14-15 (citations omitted).  Plaintiff cannot meet either of these prongs.  Plaintiff testified that his email to Farrell was an "attempt[]" to complain about discrimination, but acknowledged that his email did not indicate that he was

lodging a complaint.  (Barney Dep. 109:5-20).  Plaintiff also testified that he
attempted to "follow up" on his email to Farrell, including by calling him on the
phone, and planning to speak to him at a clinical case manager symposium.
(*Id.* at 110:9-111:24).  Plaintiff himself appears to recognize that his email was
at best, a precursor to complaining about Goodrich's conduct.

Conversely, Plaintiff's email to Farrell was "so vague and generalized"
that it could not reasonably have been understood to be directed at any
prohibited conduct.  *See Gonzalez* v. *N.Y.C. Health & Hosp. Corp.*, No. 18 Civ.
2645 (JPO), 2019 WL 2435622, at *10 (S.D.N.Y. June 11, 2019).  His email
references neither Goodrich nor any adverse conduct, let alone discrimination
on the basis of his sexual orientation.  It is not properly understood as a
complaint under the standards of Title VII and the NYSHRL.  *See Manoharan* v.
*Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 594 (2d Cir.
1988) (holding that plaintiff failed to meet his burden where his complaints
"neither pointed out discrimination against particular individuals nor
discriminatory practices").  Courts in this District have found that far less
"generalized" employee complaints do not constitute protected activity.  *See,
e.g.*, *Gonzalez*, 2019 WL 2435622, at *10 (finding complaint "too generalized"
where it indicated that plaintiff was "suffering harassment," but "[said] nothing
about the harassment being based on a protected characteristic"); *Lugo* v. *Le
Pain Quotidien*, No. 13 Civ. 6450 (JMF), 2015 WL 1808558, at *7 (S.D.N.Y.
Apr. 13, 2015) (deeming complaint insufficient where plaintiff "conceded in his
deposition that he did *not* suggest [in his complaint] that he had encountered

any race or national origin discrimination"); *Ochei* v. *Coler/Goldwater Mem'l Hosp.*, 450 F. Supp. 2d 275, 287 (S.D.N.Y. 2006) ("[Plaintiff] has claimed that she was retaliated against for complaining about observations of her work, and other allegedly adverse actions.  However, because she does not allege that she ever complained to her supervisors that she was the victim of discrimination, these complaints are not protected activity as a matter of law.").  Plaintiff's conclusory assertion that Goodrich necessarily knew that he was emailing Farrell to complain about her alleged discriminatory comments — when he had never before complained about discrimination, and his email indicated nothing of the sort — does not compel a different finding.[30]

Plaintiff's NYCHRL claim suffers from the same defect as his federal and state claims.  The NYCHRL's requirement of protected conduct "is satisfied when a party communicates to the employer defendant, in substance, that [he] believes the defendant's treatment of [him] is discriminatory."  *Marseille* v. *Mount Sinai Health Sys.*, No. 18 Civ. 12135 (VEC), 2021 WL 3475620, at *12 (S.D.N.Y. Aug. 5, 2021) (quoting *Thompson* v. *Corizon Health, Inc.*, No. 18 Civ. 7139 (LGS), 2021 WL 105767, at *6 (S.D.N.Y. Jan. 12, 2021)).  Moreover, "[g]eneral complaints about a supervisor's behavior, when there is 'no

---

[30]    Plaintiff's proffered caselaw is of little use on this point, as it focuses entirely on the temporal proximity between Plaintiff's email to Farrell and his termination, rather than on the key issue of whether Plaintiff's email constituted protected activity.  (Pl. Opp. 22). Moreover, Plaintiff's argument about temporal proximity is undermined by the very timeline presented in his briefing.  In particular, Plaintiff asserts that Goodrich decided to terminate him on June 9, 2017 (*see id.*) — three days before he emailed Farrell — and that prior to that date she sought to find a basis for rationalizing his termination (*see id.* at 24 (asserting that Goodrich "fabricated" a phone call with Plaintiff's client "to support her claim to have him removed from employment, after realizing that the 'unapproved' visit would not be enough to justify his termination")).

indication ... that [defendant] knew or should have known' that the behavior was the result of a discriminatory motive, are not protected activity." *Id.* (quoting *Tomizawa* v. *ADT LLC*, No. 13 Civ. 6366 (MKB) (LB), 2015 WL 5772106, at *4 (E.D.N.Y. Sept. 29, 2015)). Even viewed under the more liberal standard of the NYCHRL, Plaintiff's email to Farrell does not suffice, as it provided no indication that he believed he was subject to discriminatory treatment. *See Woldeselassie* v. *Am. Eagle Airlines/Am. Airlines*, No. 12 Civ. 7703 (LGS), 2015 WL 456679, at *8 (S.D.N.Y. Feb. 2, 2015). Accordingly, the Court grants summary judgment in Defendant's favor on Plaintiff's retaliation claims.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART. The following claims are dismissed with prejudice: (i) Plaintiff's hostile work environment claims brought under Title VII and the NYSHRL, and (ii) Plaintiff's retaliation claims brought under Title VII, the NYSHRL, and the NYCHRL. What remains are Plaintiff's hostile work environment claim under the NYCHRL and his unlawful termination claims under Title VII, the NYSHRL, and the NYCHRL.

The Clerk of Court is directed to terminate the motion at docket entry 41. The parties are directed to submit a joint letter regarding their proposed next steps on or before **October 20, 2021**.

SO ORDERED.

Dated:        September 20, 2021
              New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge